SACKETT & WILHELMS LITHOGRAPHING & PRINTING CO. et al. v. NATIONAL ASS'N OF EMPLOYING LITHOGRAPHERS et al.

(Supreme Court, Appellate Division, First Department. January 19, 1912.)

ASSOCIATIONS (§ 15*)—PROPERTY AND FUNDS.

In expectation of labor troubles, an association of employing lithographers was formed for the purpose of arbitrating disputes with labor unions and for the establishment of the open shop upon hostile action by any union against a member of the association. The corporation plaintiff was represented in this by one of its directors who signed the certificate of incorporation, and was made a director of the association. The constitution adopted provided that only manufacturing lithographers who had no agreements with trade unions were eligible as members; that members must agree to abide by the constitution and by-laws and

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the rules and orders of directors thereafter passed. It was also provided that the application for membership by a stockholder or director of a corporation should be accompanied by written request of his company for his admission. Other articles provided that membership fee should be $500 for each power press operated or owned by the member, and might be paid by a three months' note, its date to be left blank, which blank might be filled in whenever the association wished to collect. The plaintiff became a member through the stockholder mentioned, his note for membership fee being indorsed by the treasurer of the plaintiff under a resolution of its board of directors. Upon a refusal of a labor union to arbitrate troubles, the association by resolutions of its directors declared the open shop, and later resolved that members of striking unions should not be taken back to work while they retained their membership. The plaintiff later, while still a member of the association and represented on its board of directors and without any notification, agreed with a union to take back union men, and immediately sued to restrain negotiation of the note given for membership, claiming that the note was not given for a membership fee, but was in the nature of a penalty to enforce the obligations of membership and that as the resolution excluding union men was not a lawful rule of the organization, the penalty could not be enforced for its disobedience. *Held* as the constitution of the association gave the board of directors absolute power to do all acts in furtherance of the purposes of the corporation, which was industrial peace in the lithographic trade, a resolution refusing to take back the members of striking unions who had refused to arbitrate, was entirely justified as a war measure, and was authorized by the grant of power to such directors, and, as the plaintiffs bound themselves to abide by such acts, there is no such equity shown as would entitle them to restrain negotiation of their note.

[Ed. Note.—For other cases, see Associations, Dec. Dig. § 15.*]

Laughlin, J., dissenting. Ingraham, P. J., dissenting in part.

Appeal from Special Term, New York County.

Action by Sackett & Wilhelms Lithographing & Printing Company and another against the National Association of Employing Lithographers and others. From a judgment (61 Misc. Rep. 150, 113 N. Y. Supp. 110) dismissing the complaint and with an allowance for costs, etc., to plaintiffs, defendants appeal in part. Reversed as to part appealed from, and judgment directed.

See, also, 120 App. Div. 882, 105 N. Y. Supp. 1141.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and MILLER, JJ.

Wile & Oviatt (Charles E. Rushmore, of counsel, and Henry Root Stern, on the brief), for appellants.

J. Aspinwall Hodge, for respondents.

CLARKE, J. In 1904, there had been serious trouble between employing lithographers and their employés, resulting in a general suspension of work. This was ended by a one year's working agreement made between the employers and the unions, which was renewed for a further year, the renewed agreement expiring in April, 1906. A further tentative agreement was reached at a conference between representatives of the employers and representatives of the unions, subject to a ratification by a vote of the members of the unions. The

men remained at work, but it was expected that labor troubles and strikes were impending.

Under these conditions a meeting known as the Pittsburg convention was held in Pittsburg, May 22, 23, and 24, 1906, which was attended by representatives of a large number of lithographic employers in the country. It was decided to form an association of lithographic employers and to incorporate under the membership corporations law of New York. Consol. Laws 1909, c. 35. A declaration of principles was unanimously adopted by the convention as follows:

"First. Prior to the commission of hostile action on the part of any union toward any member of the association, we favor the settlement of disputes with unions by reference of such questions to properly constituted boards of conference and arbitration, and should any labor union or unions approve and have ratified by its members the form of conference and arbitration agreement which is hereto appended, upon the offering to us of said agreement for a term of not less than five years, we bind ourselves to accept and ratify it. Second. In the event of the commission of any hostile action on the part of any union or unions toward any member of this association, the 'open shop' shall be established with reference to such hostile union or unions, under such shop rules and practices as may be adopted by this national association."

As a result the defendant National Association of Employing Lithographers was incorporated May 31, 1906, under the membership corporations law. The certificate of incorporation stated that the purposes and objects thereof are:

"To foster the business of lithographers, to reform abuses therein, to secure for ourselves and our business freedom from unjust and unlawful exactions, to produce uniformity and certainty in the customs and usages of the business, to settle differences among the members of the corporation, to promote a more enlarged and friendly intercourse between the members, to maintain amicable relations between the members and their employés, to prevent unjust and unreasonable discrimination against any person or persons by any combination, person or conspiracy in any matter relating to the business of the members of the corporation, and in general to foster and advance the industrial progress of the lithographic trade."

The plaintiff corporation is a domestic corporation formed under the business corporation law (Consol. Laws 1909, c. 4) to carry on the business of lithographing and printing, and the individual plaintiff, Harold Bunker, is a stockholder thereof, and in the spring of 1906 was a director and officer. He attended the Pittsburg convention and represented the plaintiff. He signed the certificate of incorporation of the defendant and was named therein as one of its directors.

The constitution adopted by the defendant incorporated the declaration of principles. It provided:

"Article I. Restrictions. The members of this corporation shall be restricted to such persons as are engaged individually, or are members of firms or are stockholders in corporations which are engaged in the business of lithographing, and own and operate lithographic power presses. No applicant shall be admitted to membership in this corporation who, as an individual, or whose firm or corporation has any agreement with any labor union in the lithographic trade."

"Section 2. Applications. * * * The applicant shall also in his application agree that he will abide by the constitution and by-laws of this corporation and by the rules, directions and orders of the board of directors and of all duly authorized committees, and that the firm or corporation which he rep-

resents shall do likewise. Upon election to membership the applicant shall qualify and become a member only after the payment of his membership fee. Such application for membership, if the applicant is a member of a firm or a stockholder in a corporation which is to be represented in this corporation, shall be accompanied by a written request of such partnership or corporation that the applicant be admitted to membership."

"Article III. Sec. 5. Directors. The board of directors shall manage the property and affairs of this corporation, and shall have absolute and complete power to do any and all acts in furtherance of the purposes and objects of this corporation, except such as is expressly reserved to the members by this constitution, is vested in this board."

"Article VIII. Controversies. Section 1. Duties of Members. Each member of this corporation shall be bound and governed by the declaration of principles of this corporation in all its relation with his lithographic employés or with organized labor in the lithographic trade and shall also be required to strictly observe such additional rules and regulations as may from time to time be adopted by this corporation or the board of directors thereof, or any committee acting by the authority of such board of directors for the government of the relations of the members of this corporation with such employés and to such organized labor."

"Article XI. Section 1. Membership Fees. Every incorporation member and each new member elected shall pay into the treasury of this corporation a membership fee in an amount to be fixed by the board of directors and which shall be computed at the rate of $500 for each lithographic power press operated or owned by the member of this firm or corporation."

"Section 5. Loan of Funds. The board of directors may loan to any member from the funds of this corporation an amount not exceeding the membership fees of such member, provided such fees have been paid into the treasury of the corporation in cash, and such borrowing member shall give to this corporation for this loan a note made by himself, and, if such member represents a firm or corporation, indorsed by such firm or corporation. Such note shall be made payable three months after date, and its date shall not be filled in but shall be blank. The blank in the date of the said note may be filled in at any time that this corporation shall determine to collect or to negotiate said note by either the president or the treasurer of this corporation or by any person authorized so to do by the board of directors. The board of directors may take from a member a similar note in payment of the member's membership fee. Such note shall at all times represent legal debts from such member to the corporation and the statute of limitations shall not be pleaded or taken advantage of by any maker or indorser of said note."

The required application for membership containing the required agreements was executed by Harold Bunker and the Sackett & Wilhelms Company on or about June 5, 1906, and the amount of the membership fee required was fixed by the board of directors at $11,-500. The board adopted the following resolution:

"Whereas a large number of members of this association have offered and desire to pay their membership fees by notes, in accordance with the provisions of the constitution; and whereas there is no immediate necessity that the treasury of this corporation should contain any very large amount of cash there being no immediate use for the same: Now therefore be it resolved by the board of directors of the National Association of Employing Lithographers that this corporation and its officers be and they are hereby empowered to accept notes of the form attached to this resolution from each member, now or hereafter belonging to this association, in payment of the membership fee of such member."

On or about June 12, 1906, the following note was executed and delivered to the said association, undated:

"$11,500. ———, 190–. Three months after date I promise to pay to the order of the National Association of Employing Lithographers $11,500 at

Traders' National Bank, Rochester, N. Y., value received. No.————. Due ————. Harold Bunker.

"Indorsement: Take notice that this note cannot be negotiated by the within payee except on its indorsement by its treasurer and countersigned by its president and by the chairman of its finance committee. The statute of limitations and all notices of protest, etc., are waived by the undersigned indorsers: Sackett & Wilhelms Litho. & Ptg. Co. Julius Herman, Treasurer."

The board of directors of the plaintiff corporation passed a resolution that it was the opinion of such board that the welfare of their company would be advanced and its business interests protected by representation through one of its stockholders in the National Association of Employing Lithographers and authorized Bunker to obtain membership in the association and empowering its treasurer to indorse any note which the association might require in payment of his membership fee. The authorization is as follows:

"It being understood that the undersigned Harold Bunker is indebted to the National Association of Employing Lithographers in the amount of $11,-500 and said association being willing to accept a note representing said indebtedness," etc.

In July, 1906, the unions of lithographic employés demanded an eight-hour day. There was also a difference between the employers and employés on the question of apprentices. On the 27th of July the board of directors of the defendant adopted the following resolution:

"Whereas the L. I. P. & B. A. (meaning the Lithographers' International Protective and Beneficial Association) have committed a hostile act against this association and its members in that said L. I. P. & B. A. have refused an offer to arbitrate the demand they have made for a 48-hour week; therefore, be it resolved that the National Association of Employing Lithographers adheres to its declarations of principles and favors the settlement of all disputes with unions by reference of such questions to properly constituted board of conference and arbitration, and it is further resolved that the open shop ought to be, and with due regard for the existence and welfare of the lithographic trade must be declared towards any union which has repudiated such a plan of amicable adjustment and has insisted upon resting the justice of its demands upon a strike and a test of strength; and it is further resolved that, in the departments in which the members of the L. I. P. & B. A. have been or are employed, the open shop shall hereafter exist and its principles be enforced."

On August 1st, a conference was held between the representatives of the defendant corporation and the unions which failed to reach any agreement and on August 2, 1906, a strike was begun by the unions of lithographic employés against all the firms and corporations represented in the association.

At a meeting of the board of directors on September 21, 1906, at which meeting Mr. Bunker was present, the following resolution was unanimously adopted:

"Whereas the National Association of Employing Lithographers have declared the open shop in respect to such unions as by refusing arbitration and by striking have seriously endangered the welfare of the lithographic industry, and whereas, for nearly eight weeks the strikers have had the opportunity to return to work but have refused to do so, and have rejected and repudiated the open shop; and whereas, thirty-five per cent. of the presses of the country struck August 2nd are now running under present conditions,

and whereas the restriction of output being removed from said presses, they show a material increase in production: Now, therefore, be it resolved by the board of directors of the National Association of Employing Lithographers that in order to maintain the conditions which have been established by the members of this association, and in order to prevent the control of the industry from again drifting into union hands, no member of this National Association of Employing Lithographers shall take back, until further order of the board of directors, any workman who retains his membership in the Lithographers' International Protective & Beneficial Association of the United States and Canada, the Lithographic Artists', Engravers' & Designers' League of America, and the International Association of Lithographic Apprentices and Press Feeders of the United States and Canada, and the Lithographic Stone and Plate Preparers' Association of the United States and Canada."

The following resolution was also adopted:

"That the secretary be and he hereby is directed to serve a copy of the resolution just passed on each member of the association, and upon the managers of the employment bureaus; and the managers of said bureaus be directed to see to it, in so far as it lies in their power, that no violation of said resolution takes place, and that if any does take place, that it be reported to the executive committee, or to the board of directors, if in session."

Mr. Bunker testified:

"At the time the resolution was in discussion it was stated by a number of the directors, I think Mr. Donaldson, Mr. Bien and myself, the three of them, that it was not intended to make that a permanent resolution but merely a temporary expedient in our contest with the unions. It was said that the idea was that we ought to get a sufficient proportion of nonunion men in the shops to insure that there be some nonunion men left in the trade when we got through. As soon as that proportion had been reached, then the idea was that we should rescind the resolution."

The strike thereafter continued. At all the meetings of the board of directors Mr. Bunker attended and took part until March 27, 1907. In March the plaintiff corporation, after a week's negotiation and while still acting with the association and conferring with its officers and committees, and without withdrawing therefrom or notification thereto, made an agreement with the unions to employ union men in the future.

On the 15th day of March, 1907, this equitable action was commenced, the complaint alleging inter alia:

"The said note is void and unenforceable against the plaintiffs by the National Association of Employing Lithographers, but the said association has threatened to negotiate the note and put it in the hands of a bona fide holder, against whom the plaintiffs could not interpose their defenses to the note. If this were done, the plaintiffs would be without an adequate remedy at law."

Wherefore, plaintiffs asked judgment that the defendants be enjoined from negotiating, indorsing, or otherwise transferring the said note, that the note be delivered up and canceled and for such other relief as may be just.

A preliminary injunction was obtained, but was vacated for technical defects, whereupon the note was dated April 9, 1907, due July 9, 1907, indorsed by the defendant and countersigned by its president and chairman of its finance committee and deposited in the Yorkville Bank. The preliminary injunction was subsequently issued. The due

date of the note arrived before the trial of this action and as the reason for equitable interference no longer existed at the time of trial the learned Special Term (61 Misc. Rep. 150, 113 N. Y. Supp. 110) dismissed the complaint, but adjudged that a cause of action existed at the commencement of the action and when the preliminary injunction had been granted, and granted costs and an allowance to the plaintiffs. From said part of the judgment entered thereon, defendant appeals.

The appellant claims that the note was given in payment of membership fees as required by the constitution of the defendant, of which the plaintiff Bunker, who drew the note, and the plaintiff company, which indorsed it, were fully cognizant; that they joined the association and received its benefits, which was full consideration for the note, and that all of the evidence as to matters subsequent thereto were irrelevant and immaterial and should not have been admitted. The respondent claims that the note was not in fact given for membership fees, but was in the nature of a bond or penalty to enforce the obligations of membership; that it was ultra vires the plaintiff corporation to indorse said note; that the resolution of the defendant corporation of September 21, 1906, creating the closed shop was ultra vires the defendant corporation, and in direct hostility to its constitution and without force and effect; that the defendant was an illegal association in restraint of trade.

The basis of the judgment was that the said resolution which established a closed shop was in direct violation of the defendant's constitution and therefore invalid; that this was not a case where the plaintiffs violated a lawful regulation or rule of the association of which they were members; and that the note to restrain the negotiation of which this action was brought, while nominally given in payment of membership fees, was in fact given only as a penalty, to be enforced upon disobedience of the rules and regulations of the defendant; that, while a court of equity might well refuse to restrain the negotiation of notes given as a penalty for disobedience of lawful rules and regulations, the claim that it cannot restrain negotiation where an attempt is made to treat them as a forfeit because the plaintiff disobeyed an *unlawful* regulation is untenable. A contest between capital and labor is not here involved. The underlying question is, Has the defendant corporation the right to negotiate the note given to it by one of its members as in payment of membership fees under its constitution? The decision has gone on the narrow ground that it has not, because its resolution of September 21, 1906, was unauthorized. The plaintiff Bunker representing the plaintiff corporation was one of the organizers of the defendant. He and it were in from the start, and before the start, when, as early as 1902, a voluntary association, the Lithographers Association (East), was formed, composed of a union of employers, of which Mr. Wilhelms the president of the plaintiff was president. In his report to his stockholders dated February 24, 1904, he recounted the history of the differences of the employers with the unions, their repudiation of agreements, threats of strikes and the generally unstable conditions. He said:

"Under these intolerable circumstances, and seeing how disastrous the situation was to the whole trade, the employers committee, representing the three associations, East, West, and Pacific, held a conference and opened negotiations with the National Union leaders with a view to establishing a yearly contract from May 1st to May 1st, on the principle of settling all disputes or demands of both parties by the method formerly adopted of joint committees, and, if necessary, resort to arbitration. These suggestions have at the present writing been utterly repudiated by the unions, who insist on their right to make their demands and to strike when and where they please. * * * Thus interfered with in their business, compelled to lose an amount of business that might otherwise be profitable, exposed at any time to attacks as of an enemy, the employing lithographers represented by the three associations named have decided to appeal to their associates and stockholders to stand by them in an effort to relieve the lithographic trade from the incubus under which it now labors, and which if continued will cause its ruin and the ruin of the employers and employed as well. * * * They have reached the firm determination that their business and their profits, and even the wages paid their men shall no longer be subjected to injury and diminution by the untimely and unjust actions and strikes or threats to strike of irresponsible trade union leaders who resist the principle of arbitration that has come to be indorsed throughout the country. What will result from this attitude, whether peace or war, we cannot tell. But we believe that, however disastrous may be the immediate results to the parties concerned, the final results will be of the greatest advantage both to the employers and employés."

The defendant corporation was formed so that there might be collective bargaining between the employers and the unions. It was designed to bring about industrial peace. Its purposes were legitimate and commendable. Some such device is essential since labor is organized as it is. It was incorporated on the eve of a general strike. It declared for arbitration and as a war measure—in case of hostility on the other side, for an open shop. This was not a boon to organized labor, but the reverse. The union demanded the closed shop—that is, union labor only. But the constitution which the plaintiff Bunker helped to draw gave to the board of directors "absolute and complete power to do any and all acts in furtherance of the purposes and objects of this corporation"; which was industrial peace in the lithographic trade. Its members agreed to abide by the "rules, directions and order of the board of directors," and "each member of this corporation shall be bound and governed by the declaration principles of this corporation in all his relations with his lithographic employés or with organized labor in the lithographers' trade and *shall also be required* to strictly observe *such additional rules and regulations* as may from time to time be adopted by this corporation or the board of directors thereof * * * for the government of the relation of the members of this corporation with such employés and to such organized labor." The unions had struck. The open shop had been declared. The strike had continued for eight weeks. As a further war measure, with the vote of Mr. Bunker, the board resolved that as for nearly eight weeks the strikers have had the opportunity to return to work, but have refused to do so and have rejected and repudiated the open shop, in order to prevent the control of the industry from again drifting into union hands no member *shall take back* until further order of the board any workman who retains his membership in certain enumerated unions. It seems to me that res-

olution was entirely within the grant of power given to the board, within the agreement of the members made in their application for membership, and in strict conformity to the purposes, object, design, and certificate of incorporation of the defendant. It was designed to obtain peace. War had been forced upon it. To secure peace and the open shop, it temporarily forbade the taking back of striking union men. Bunker wrote, himself, in March, 1907, about this resolution, and it was "adopted merely as a war measure and as a means to an end, namely the open shop." Plaintiff Bunker voted for it, retained his membership, and the advantage and benefits thereof, and that there were such is illustrated by plaintiff corporation's annual report of February, 1907. The report of 1904, from which I have quoted supra, advised its preferred stockholders that they must forego their dividends. This report, with the strike on from the previous August, stated "the directors wish to report that the business and finances of the company are in excellent condition. The earnings have been sufficient to enable the company to rid itself of the domination of labor unions, and, if established, the 'open shop' which we have been looking forward to for so many years. The issue has been decided after a strike extending over practically the entire lithographic Industry resulting in the unions being compelled to sue for peace," and then violated its agreement, abandoned its associates, and made a secret agreement with the union to take back its men, and *then* rushed into a court of equity to prevent the consequences of its acts.

Prior to the commencement of this action, plaintiff had never claimed that this resolution was illegal or in violation of the constitution. On the contrary, Bunker had voted for it and the plaintiff corporation had complied with it. On March 4, 1907, he wrote that in his opinion the time had come as the open shop was an established fact to rescind the resolution. It does not appear in this record what course the defendant took in regard to this note, except that *after* this action was commenced, it indorsed and deposited. It has not been paid. It is not in the hands of innocent holders for value. It is owned by the defendant, and any defenses that plaintiffs may have are available to them in an action brought on the note, if such be instituted. It was for this reason that upon the trial the plaintiffs asked for a dismissal of their complaint. The defendant does not appeal upon that portion of the judgment, but from the clause which "adjudged upon the evidence taken upon the trial of this action and upon the pleading, that the plaintiffs were entitled to the preliminary injunction granted by the court" and the provisions for costs and an extra allowance to plaintiffs.

We think that defendants were entitled to a dismissal of the complaint and that the further provisions of the judgment were unwarranted.

The judgment, therefore, so far as appealed from, should be reversed, with costs, and judgment directed to be entered dismissing the complaint, with costs to defendants.

McLAUGHLIN and MILLER, JJ., concur.

INGRAHAM, P. J. (dissenting in part). I will not dissent from the disposition of this appeal recommended by Mr. Justice CLARKE on the ground that, when the case was tried, the plaintiffs not being then entitled to equitable relief, the defendants were entitled to the dismissal of the complaint; alhough I do not think that the defendants are entitled to costs. The plaintiff corporation is a manufacturing corporation organized under the business corporation law, to carry on the business of lithographing and printing, and no express authority is shown under which the directors of the corporation were authorized to become members of any other corporation, or in its corporate capacity to become a member of the defendant the National Association of Employing Lithographers, and the plaintiff corporation itself did not attempt to become a member of such corporation. The plaintiff Bunker, however, did become an incorporator of the defendant the National Association of Employing Lithographers and was one of its board of directors. He was also a stockholder of the plaintiff corporation. By thus becoming a member of the membership corporation, he undoubtedly incurred such obligations to the corporation as its charter required, and he undoubtedly acted in joining the membership corporation on behalf of the plaintiff corporation. He gave his note to the corporation for what was called the membership fee, but what was clearly intended as an obligation to insure the compliance by each member of the membership corporation and the business corporation which he represented with the orders of its directors, and the enforcement of the note was to be a penalty for refusing such obedience. The plaintiff corporation indorsed this note, thus making the plaintiff corporation liable for the amount of the note in case the plaintiff Bunker or the plaintiff corporation refused to obey the orders of the directors of the membership corporation. I think this action by the directors of the plaintiff corporation was ultra vires and void, and the note imposed no liability upon the plaintiff corporation. It was not issued in the regular course of the plaintiffs business; it was not for the payment of any obligation of the company; and it had no relation to the business which the corporation was organized to conduct. Assuming that the officers of the plaintiff corporation and its directors concluded that the organization of this membership corporation would advance the business of the corporation, and that its adhesion to an agreement to abide by the rules or orders of the directors of the membership corporation was not illegal, I know of no authority for the directors of a business corporation to enter into an obligation to pay a large sum of money as a penalty for refusing to comply with the orders of the membership corporation in relation to the method in which it should conduct its business. The money and property used in the plaintiffs' business was the property of the plaintiff corporation, held for the benefit of its creditors and stockholders. Its directors had no power to divert the company's property from the purpose for which the corporation was organized, and I think that incurring such an obligation without at any rate the consent of the stockholders themselves was an attempt to impose a liability upon the corporation which was not within the power of the

directors; and to enforce this obligation against the corporation would have been a diversion of its funds from corporate uses which, at any rate without the direct assent of its stockholders, was illegal and void.

Other questions are presented in this case which I do not consider it necessary to discuss, as I do not agree that the directors of a business corporation can assume obligations on behalf of the company which would tend to divert the property and money of the corporation from the legitimate uses of the corporation.

LAUGHLIN, J. (dissenting). I agree with Presiding Justice IN-GRAHAM that it was not competent for the board of directors of the plaintiff corporation to bind it, through the membership of its stockholder and officer Bunker in the appellant association, by the action of the latter; but I wish also to state my views on another point, which I think shows that plaintiff had a cause of action in equity before the maturity of the note.

The declaration of principles of the employing lithographers, prior to the incorporation of the appellant association, expressly provided that in the event of hostile action on the part of any union or unions of employés toward any member of the association to be formed by the incorporation of the appellant association "the 'open shop' shall be established with reference to such hostile union or unions, under such shop rules and practices as may be adopted by this national association," meaning the appellant corporation; and by an express provision of the constitution of the appellant association, the "Declaration of Principles" became binding on the appellant association and on its board of directors, and while the board was authorized to adopt "additional rules and regulations," which would be binding on the members, it was not competent for it to adopt any rule or regulation inconsistent with the "Declaration of Principles." The action of the board of directors of the appellant association, upon which the forfeiture by the plaintiff corporation of the amount of the note is predicated, was in contravention of the "Declaration of Principles" with respect to the open-shop rule, and therefore the plaintiff corporation was at the time of the commencement of the action entitled to have the note, which had not then matured and might be negotiated to the prejudice of the plaintiffs, canceled, for if it incurred any obligation thereby, it was relieved therefrom by the appellant association's violation of the declaration of principles. Since, however, the note matured before the trial of the action, and could only be transferred then subject to any defense thereto as between the original parties, there was no necessity for equitable relief, and the complaint was properly dismissed, but with costs to the plaintiffs, since they had a cause of action for equitable relief when the action was commenced.

I therefore vote for affirmance.